**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————— :
VICTOR FABRICATORE, *d/b/a*    :     Civil Action No. 16-916 (FLW) (DEA)
HILLSBOROUGH RARE COINS,    :
    :
               Plaintiff,    :           **OPINION**
    :
        v.    :
    :
ADT LLC, *et al.*,    :
    :
            Defendants.    :
—————————————————————— :

**WOLFSON, United States District Judge:**

In this matter, Plaintiff Victor Fabricatore ("Plaintiff"), the uninsured owner of a store that specializes in the collection and sale of rare coins, seeks to obtain recovery from Defendant ADT LLC ("Defendant" or "ADT"), a company that monitored a security alarm system for Plaintiff's store, for inventory stolen during a burglary of the store. Defendant moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that Plaintiff's sole remaining claim for breach of contract is foreclosed by an exculpatory provision in the parties' contract, or, alternatively, that Plaintiff's damages are limited by a limitation of liability provision in the contract. For the reasons that follow, Defendant's Motion is granted in part and denied in part.

## I.      BACKGROUND[1]

### A.      The Parties

---

[1] For the purposes of the instant Motion, the Court draws the relevant facts from the parties' Local Rule 56.1 statements. These facts are undisputed, except where noted, and are construed in the light most favorable to Plaintiff, the non-moving party on this Motion.

Mr. Fabricatore is the sole owner and operator of Hillsborough Rare Coins ("HRC"), a business engaged in the collection and sale of rare coins. Statement of Material Facts in Support of Defendant ADT LLC's Motion for Summary Judgment ("Def.'s Statement"), ¶¶ 1-2, 30; Plaintiff's Responsive Statement of Material Facts ("Pl.'s Resp."), ¶¶ 1-2, 30. ADT is a limited liability company that provides a broad range of alarm monitoring services for commercial and residential properties.

**B.** **The Alarm Services Contract**

In 2006, Plaintiff purchased an alarm system from ADT for the HRC store located in Green Brook, New Jersey (the "Store"). Plaintiff's Supplemental Statement of Material Facts ("Pl.'s Statement"), ¶ 1; ADT LLC's Response to Plaintiff's Supplemental Statement of Material Facts ("Def.'s Resp."), ¶ 1.[2] On September 26, 2014, HRC and ADT entered into a subsequent contract (the "Contract") to upgrade and convert the alarm system to ADT's "Pulse" system. Def.'s Statement at ¶ 8; Pl.'s Resp. at ¶ 8. The Contract states that, in exchange for a monthly fee of $63.00, ADT agreed to provide, *inter alia*, the following "Signal Receiving and Notification Service":

> **B. SERVICES.** ADT agrees to provide the services indicated on page two (2), which include any of the following ("Services"):
>
> . . .
>
> **2. Signal Receiving and Notification Service.** Signal Receiving and Notification Service shall be provided by ADT if this Contract includes a charge for Service. *If an alarm signal registers at ADT's [Customer Monitoring Center ("CMC")], ADT shall endeavor to notify the appropriate Police or Fire Department and the designated representative of the Customer.* If a burglar alarm signal or fire signal registers at ADT's CMC, ADT at it sole discretion may endeavor to contact Customer's premises by

---

[2] According to Plaintiff, ADT forged Plaintiff's signature on the 2006 contract (the "2006 Contract") pertaining to the original installation of the alarm system for the Store. *See* Pl.'s Statement at ¶¶ 4-10.

telephone (or, in the case of a burglar alarm system only, by Two-Way Voice if such monitoring service has been elected by Customer) to verify that the alarm is not false. Failing to contact Customer promptly or questioning the nature of the response received upon such contact, ADT shall endeavor to notify the appropriate Police Department or Fire Department. Customer agrees that ADT shall have no liability pertaining to any Two-Way Voice communication or its publication. If a supervisory signal or trouble signal registers at ADT's CMC, ADT shall endeavor to notify the designated representative of the Customer.

Small Business Contract ("Contract"), Def.'s Mot. for Summ. J., Ex. D at 4, ¶ B (italics added).

Although Plaintiff signed the Contract on behalf of HRC, Plaintiff testified he may or may not have actually read the Contract before signing it. Deposition Transcript of Victor Fabricatore ("Fabricatore Dep."), at 47:12-48:5; *see* Def.'s Statement at ¶¶ 10, 12; Pl.'s Resp. at ¶¶ 10, 12. Above the signature line, the Contract provides, in relevant part: "**I acknowledge and agree to each of the following: (A) this Contract consists of six (6) pages. Before signing this Contract, I have read, understand and agree to each and every term of this Contract, including but not limited to Paragraphs C and E of the important terms and conditions.**" Contract at 1 (emphasis in original). The Contract also includes an integration clause, which states that "[t]his Contract constitutes the entire agreement between Customer and ADT." *Id.* at 6, ¶ L.

Paragraph E of the Contract, entitled, "**LIMITATIONS ON LIABILITY**," contains several provisions that are relevant to the instant dispute. *Id.* at ¶ E (emphasis in original). The first of those provisions (the "Exculpatory Provision") explains that although ADT agrees to provide alarm services, it is not an insurer, and thus, that the amounts charged to Plaintiff are based on the services provided by ADT, rather than the value of Plaintiff's property. *See id.* at ¶ E(1)-(2). The Exculpatory Provision further provides that ADT cannot be held liable as an insurer for losses related to an event that ADT's alarm system is designed to detect or avert. *See id.* Specifically, the Exculpatory Provision states:

**1. ADT IS NOT AN INSURER. THE AMOUNTS ADT CHARGES CUSTOMER ARE NOT INSURANCE PREMIUMS. SUCH CHARGES ARE BASED UPON THE VALUE OF THE SERVICES, SYSTEM AND EQUIPMENT ADT PROVIDES AND ARE UNRELATED TO THE VALUE OF CUSTOMER'S PROPERTY, ANY PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES, OR ANY RISK OF LOSS ON CUSTOMER'S PREMISES.**

**2. ADT'S SERVICES, SYSTEMS AND EQUIPMENT DO NOT CAUSE AND CANNOT ELIMINATE OCCURRENCES OF THE EVENTS THEY ARE INTENDED TO DETECT OR AVERT. ADT MAKES NO GUARANTY OR WARRANTY . . . THAT THE SERVICES, SYSTEM OR EQUIPMENT SUPPLIED WILL DETECT OR AVERT SUCH EVENTS OR THE CONSEQUENCES THEREFROM. ACCORDINGLY, ADT DOES NOT UNDERTAKE ANY RISK THAT CUSTOMER'S PERSON OR PROPERTY, OR THE PERSON OR PROPERTY OF OTHERS, MAY BE SUBJECT TO INJURY OR LOSS IF SUCH EVENT OCCURS. THE ALLOCATION OF SUCH RISK REMAINS WITH THE CUSTOMER, NOT ADT. INSURANCE, IF ANY, COVERING SUCH RISK SHALL BE OBTAINED BY THE CUSTOMER. ADT SHALL HAVE NO LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO EVENTS, OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEMS OR SERVICES ARE INTENDED TO DETECT OR AVERT. CUSTOMER SHALL LOOK EXCLUSIVELY TO ITS INSURER AND NOT ADT TO PAY THE CUSTOMER IN THE EVENT OF ANY SUCH LOSS, DAMAGE OR INJURY. CUSTOMER RELEASES AND WAIVES FOR ITSELF AND ITS INSURER ALL SUBROGATION AND OTHER RIGHTS TO RECOVER FROM ADT ARISING AS A RESULT OF PAYING ANY CLAIM FOR LOSS, DAMAGE OR INJURY OF CUSTOMER OR ANOTHER PERSON.**

*Id.* (emphasis in original).

The Contract also includes a provision (the "Limitation of Liability Provision") that limits ADT's liability in the event that it fails to perform its contractual obligations. *See id.* at ¶ E(3). Specifically, the Limitation of Liability Provision states:

**3. IF NOTWITHSTANDING THE PROVISIONS OF THIS PARAGRAPH E, ADT IS FOUND LIABLE FOR LOSS, DAMAGE OR INJURY UNDER ANY LEGAL THEORY DUE TO A FAILURE OF THE SERVICES, SYSTEM OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $1,000, WHICHEVER IS GREATER, AS AGREED UPON DAMAGES AND NOT AS A PENALTY, AS CUSTOMER'S SOLE REMEDY. THIS WILL BE THE SOLE REMEDY BECAUSE IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO DETERMINE THE ACTUAL DAMAGES, IF ANY, WHICH MAY RESULT FROM ADT'S FAILURE TO PERFORM ANY OF ITS OBLIGATIONS UNDER**

**THIS CONTRACT. IF CUSTOMER REQUESTS, ADT MAY ASSUME
GREATER LIABILITY BY ATTACHING A RIDER TO THIS CONTRACT
STATING THE EXTENT OF ADT'S ADDITIONAL LIABILITY AND THE
ADDITIONAL CHARGES CUSTOMER WILL PAY FOR ADT'S ASSUMPTION
OF SUCH GREATER LIABILITY. HOWEVER, SUCH ADDITIONAL
CHARGES ARE NOT INSURANCE PREMIUMS, AND ADT IS NOT AN
INSURER EVEN IF IT ENTERS INTO SUCH A RIDER.**

*Id.* (emphasis in original).

Finally, Paragraph E provides that:

**4. THE PROVISIONS OF THIS PARAGRAPH E SHALL APPLY NO MATTER
HOW THE LOSS, DAMAGE OR INJURY OR OTHER CONSEQUENCE
OCCURS, EVEN IF DUE TO ADT'S PERFORMANCE OR
NONPERFORMANCE OF ITS OBLIGATIONS UNDER THIS CONTRACT OR
FROM NEGLIGENCE (ACTIVE OR OTHERWISE), STRICT LIABILITY,
VIOLATION OF ANY APPLICABLE CONSUMER PROTECTION LAW OR
ANY OTHER ALLEGED FAULT ON THE PART OF ADT, ITS AGENTS OR
EMPLOYEES.**

*Id.* at ¶ E(4) (emphasis in original).

### C. The Burglary

At approximately 10:30 p.m. on June 1, 2015, a group of burglars broke into the Store by

cutting through the wall of an adjoining business and disarming the Store's alarm system. *See*

Def.'s Statement at ¶ 20; Pl.'s Resp. at ¶ 20. The circumstances concerning the triggering of

ADT's alarm system and ADT's response to the alarm are not entirely clear from the record. To

begin, it is undisputed that, when the burglars first entered the Store, the ADT alarm system was

triggered. *See* Def.'s Statement at ¶ 22; Pl.'s Resp. at ¶ 22. It is further undisputed that ADT's

Pulse team sent Plaintiff an email (the "Notification Email") notifying him that a silent panic

alarm had been triggered at 10:36 p.m. at the Store. *See* Def.'s Statement at ¶ 23; Pl.'s Resp. at ¶

23; Pl.'s Statement at ¶ 38; Def.'s Resp. at ¶ 38. Although the time stamp on the Notification

Email shows that it was received by Plaintiff at 11:06 p.m., Plaintiff asserts that he did not see

the Notification Email until the burglary was over, because it went directly into his "spam"

folder. *See* Pl.'s Statement at ¶ 40; Certification of Victor Fabricatore in Opposition to Motion for Summary Judgment ("Fabricatore Cert."), Ex. C.

The parties dispute whether an alarm signal ever registered at ADT's CMC. *See* Pl.'s Statement at ¶ 39; Def.'s Resp. at ¶ 39. According to Plaintiff, although ADT was aware that the silent alarm had been triggered, ADT breached its contractual obligations by failing to call Plaintiff and to contact the police. Pl.'s Statement at ¶ 39. Conversely, despite acknowledging that it sent Plaintiff the Notification Email regarding the silent panic alarm, Defendant denies that an alarm signal ever registered at ADT's CMC. Def.'s Resp. at ¶ 39.

In any event, at approximately 11:20 p.m. on the night of the burglary, an ADT representative (the "ADT Representative") called Plaintiff to inform him that a "trouble signal" was received from the ADT alarm system, indicating that there had been a power loss to the system. Pl.'s Statement at ¶¶ 41-53; Def.'s Resp. at ¶¶ 41-43. The ADT Representative assured Plaintiff that the system was still functioning on battery backup and explained that Plaintiff would receive a call in the event that battery backup failed. *See* Pl.'s Statement at ¶¶ 45-46; Def.'s Resp. at ¶¶ 45-46. It is undisputed that the ADT Representative never informed Plaintiff that, in addition to the power loss signal, there was also an alarm signal indicating an entry into the Store.[3] Pl.'s Statement at ¶ 47; Def.'s Resp. at ¶ 47. According to Plaintiff, the burglars remained in the Store for approximately three hours. *See* Pl.'s Statement at ¶ 36. Ultimately, the thieves escaped with valuable rare coins and other merchandise, representing somewhere between 25-50% of HRC's inventory. *See* Def.'s Statement at ¶¶ 21, 25; Pl.'s Resp. at ¶¶ 21, 25.

---

[3] Once again, Defendant attributes the ADT Representative's failure to inform Plaintiff of the alarm signal regarding the entry into the Store to the fact that an alarm signal never registered at ADT's CMC. *See* Def.'s Resp. at ¶ 47.

Following the burglary, Lieutenant William Cowan from the Green Brook Police Department spoke with an operator for ADT's Pulse team (the "Operator") regarding the burglary. Pl.'s Statement at ¶ 49; Def.'s Resp. at ¶ 49; *see* Transcript of December 13, 2017 Conversation ("Operator Tr."), Pl.'s Opp. to Def.'s Mot. for Summ. J., Ex. A. The Operator explained that, in her experience, ADT's Pulse team always dispatches the police upon receipt of a silent panic alarm signal at the CMC. Operator Tr. at 48:1-8. Thus, when questioned as to why ADT would have sent out the Notification Email without dispatching the police, the Operator stated her belief that the alarm must have been disabled, such that the CMC did not receive "the signal on the monitoring side." *Id.* at 48:21-49:23. Yet, when Lieutenant Cowan noted that the alarm was not ripped off the wall until approximately one hour after the break-in, the Operator was unable to explain why the CMC did not receive the panic alarm signal properly or why the police would not have been dispatched in this case. *Id.* at 50:2-51:17.

### D.    The Store's Inventory was Uninsured

It is undisputed that, at the time of the burglary, Plaintiff did not have insurance for either the Store or its inventory. Fabricatore Dep. at 71:4-22; Pl.'s Statement at ¶ 26; Def.'s Resp. at ¶ 26. Plaintiff testified that although he had previously received quotes for obtaining insurance, *see* Fabricatore Dep. at 71:23-72:5 ("Q: Ever get quotes for insurance for your inventory? A: Yes. Q: Do you remember how much the premium was? A: $8,500. Q: Per year? A: Per year per $250,000."), he chose not to get insurance because of "[t]he cost and exclusions." *Id.* at 72:6-8.

According to Plaintiff, insurance for the inventory held by the Store – "small coins that can be hidden easily and where inventory changes daily" – is "difficult to obtain and, where it is available, is cost-prohibitive." Fabricatore Cert. ¶ 25. In that regard, Plaintiff explained that when he "looked into obtaining insurance, [he] discovered that the policies offered contained so

many exclusions (while being so costly) that it made no business sense to obtain it for the type of coins [he] was dealing in." *Id.* at ¶ 26. Indeed, Plaintiff submits that, based on the exclusions that are typically contained in such policies, "a significant portion of the coins stolen during the robbery would have been excluded from coverage." *Id.* at ¶ 28. Thus, "in [Plaintiff's] experience, affordable insurance covering all of the coins in [his] store was simply not available, as a practical matter." *Id.* at ¶ 27. Defendant disputes that insurance covering the Store's inventory was not available, asserting that Plaintiff was able to obtain quotes for insurance and simply made a business decision not to insure the Store's inventory. Def.'s Resp. at ¶¶ 27-30

### E. Procedural History

On December 2, 2015, HRC filed suit against ADT in the Superior Court of New Jersey, Somerset County, Law Division. ECF No. 1. On February 1, 2016, Defendant removed the action to this Court, pursuant to 28 U.S.C. § 1441, on the basis of diversity jurisdiction. *Id.* On October 4, 2016, HRC filed a First Amended Complaint, asserting claims for: (i) breach of contract; (ii) promissory estoppel; (iii) equitable estoppel; (iv) breach of the implied covenant of good faith and fair dealing; (v) breach of warranty; (vi) violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1, *et seq.*; (vii) violation of the New Jersey Products Liability Act ("NJPLA"), N.J.S.A. § 2A:58C-1, *et seq.*; and (viii) theft or civil conspiracy to commit theft. ECF No. 30.

On May 2, 2007, the Honorable Mary L. Cooper, U.S.D.J., granted Defendant's Motion to Dismiss all of the claims asserted in the First Amended Complaint, with the exception of HRC's breach of contract claim. ECF Nos. 39-40. Significantly, Judge Cooper found that HRC stated a plausible claim for breach of contract that was not subject to the Exculpatory Provision contained in Paragraph E of the Contract, because: (i) HRC alleged that ADT breached its

contractual obligation to immediately call Mr. Fabricatore and the police if an alarm was triggered; and (ii) "HRC is not seeking coverage from ADT for the store's losses." ECF No. 39 at 9-10. Additionally, Judge Cooper found that it was premature to address ADT's argument that HRC's damages should be limited to $1,000 under the Limitation of Liability Provision. *See id.* at 10.

This matter was reassigned to me on July 10, 2017. ECF No. 45. HRC filed a Motion for Leave to File a Second Amended Complaint on September 15, 2017. ECF No. 48. On January 12, 2018, the Magistrate Judge denied HRC's Motion for Leave to File a Second Amended Complaint, insofar as HRC sought to amend its NJCFA claim,[4] and granted the Motion, insofar as HRC sought to designate Mr. Fabricatore, doing business as HRC, as the proper Plaintiff in this case. ECF Nos. 57-58. Accordingly, on January 1, 2018, Plaintiff filed the Second Amended Complaint, which is identical to the First Amended Complaint, except for the fact that Mr. Fabricatore is named as the Plaintiff. ECF No. 59. Defendant filed the instant Motion for Summary Judgment on December 20, 2017. ECF Nos. 52-55. Defendant's Motion has been fully briefed. ECF Nos. 60-62, 66-67.

## II.   LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving

---

[4] Plaintiff has moved for reconsideration of the Magistrate Judge's Order denying Plaintiff's Motion for Leave to amend the NJCFA claim. *See* ECF No. 64.

party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. If the movant satisfies its initial burden, the nonmoving party cannot rest upon mere allegations in the pleadings to withstand summary judgment; rather, the nonmoving party "must counter with specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366. Specifically, the nonmoving party "must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp*, 271 F.3d 560, 564 (3d Cir. 2001); *see Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("[A] plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case."). Thus, "a mere 'scintilla of evidence' in the nonmovant's favor" is insufficient to create a genuine issue of fact. *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (citation omitted); *see Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 45 (3d Cir. 2017) ("There is a genuine dispute of material fact if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving

party."). Ultimately, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105 n. 5 (3d Cir. 2000).

## III.   DISCUSSION

Defendant moves for summary judgment, arguing that the Exculpatory Provision operates as a complete defense to Plaintiff's breach of contract claim. Alternatively, Defendant maintains that, pursuant to the Limitation of Liability Provision, this Court should limit Plaintiff's recoverable damages to $1,000. Because the parties' arguments with respect to each of those provisions overlap, the Court will address the enforceability of the Exculpatory Provision and the Limitation of Liability Provision (collectively, the "Exculpatory Provisions") in tandem.

### A.   The Exculpatory Provisions are Enforceable

As a preliminary matter, this Court's determination of whether the Exculpatory Provisions are enforceable is complicated by Plaintiff's failure to plead with specificity the precise nature of the damages that he seeks to recover on his breach of contract claim. To that end, in the Second Amended Complaint, Plaintiff merely states that he seeks "damages" from Defendant in connection with the breach of contract claim. Second Am. Compl. at 9. Moreover, in rejecting the exact same arguments regarding the Exculpatory Provision that Defendant rehashes on this Motion, Judge Cooper found as follows:

> [The court] find[s] that HRC has stated a plausible claim of breach of contract that would not be subject to the insurer provision. HRC has stated that under the contract, ADT had an obligation to immediately call Fabricatore and the police if the alarm was triggered. HRC is not seeking coverage from ADT for the store's losses. Rather, according to HRC, the alarm was triggered but no phone call followed. Therefore, ADT broke their contractual obligation.

*See* ECF No. 39 at 9-10.  Stated differently, Judge Cooper found that she did not need to address the enforceability of the Exculpatory Provision, because Plaintiff is not seeking to recover the Store's losses as a result of the burglary in connection with the breach of contract claim.  *See id.* However, in his Opposition brief, Plaintiff indicates that he "has brought the within action against [Defendant] for losses arising from a burglary occurring at HRC's store . . . ."  Pl.'s Br. at 2.

In any event, this Court can only discern two categories of damages that Plaintiff may seek to recover in connection with his breach of contract claim:  (i) losses arising from the burglary, *i.e.*, the stolen goods and property damage; and (ii) compensatory damages for the cost of ADT's services, including past premiums.  The first category of those damages clearly falls within the ambit of the Exculpatory Provision, which provides that "**ADT SHALL HAVE NO LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO EVENTS, OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEMS OR SERVICES ARE INTENDED TO DETECT OR AVERT**."  Contract at 6 ¶ E(2) (emphasis in original).  Additionally, the Limitation of Liability Provision, which sets forth a limitation on damages in the event that Defendant is held liable for failing to perform its contractual obligations, covers the second category of potential damages in this case.[5]  Accordingly, because the Exculpatory Provisions are facially applicable to any damages that Plaintiff may seek in this action, the Court must examine the enforceability of those Provisions.

---

[5] Indeed, while Plaintiff contends that the Limitation of Liability Provision is unenforceable, Plaintiff does not argue that his breach of contract claim seeks damages that fall outside the scope of that Provision.

New Jersey law[6] regarding exculpatory clauses[7] is well-settled. Although exculpatory clauses "have historically been disfavored in law and thus have been subjected to close judicial scrutiny," New Jersey courts "enforce contracts that contain exculpatory clauses unless such provision proves adverse to the public interest." *Stelluti v. Casapenn Enterprises, LLC*, 203 N.J. 286, 303 (2010); *see Mayfair Fabrics v. Henley*, 48 N.J. 483, 487 (1967) ("Where they do not adversely affect the public interest, exculpatory clauses in private agreements are generally sustained."). In determining whether the enforcement of an exculpatory provision would be contrary to public policy, the Supreme Court of New Jersey has directed courts to look to the four factors identified in *Gershon, Adm'x Ad Prosequendum for Estate of Pietroluongo v. Regency Diving Ctr., Inc.*, 368 N.J. Super. 237, 248 (App. Div. 2004). *See Stelluti*, 203 N.J. at 304 ("The *Gershon* test . . . captures the essential features to be explored when considering whether enforcement of an exculpatory agreement would be contrary to public policy."). To wit, *Gershon* provides:

> In New Jersey, an exculpatory release will be enforced if (1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; (3) it does not involve a public utility or common carrier; or (4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable.

368 N.J. Super. at 248.

---

[6] The parties do not dispute that New Jersey law governs this case.

[7] As the Court explains, *supra*, New Jersey regards limitation of liability provisions in alarm service contracts – including provisions that are nearly identical to the Limitation of Liability Provision – as exculpatory provisions, and thus, courts determine their enforceability under the test pertaining to exculpatory provisions. *See Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc.*, 203 N.J. Super. 477, 482 (App. Div. 1985); *see, e.g.*, *Jacobsen Diamond Ctr., LLC v. ADT Sec. Servs., Inc.*, No. A-1578-14T1, 2016 WL 3766236, at *7 (N.J. Super. Ct. App. Div. July 15, 2016) (finding that a $1,000 limitation of liability provision in a contract for the sale of a burglary alarm system was an enforceable exculpatory provision). Thus, this Court will examine whether the Limitation of Liability Provision is enforceable in accordance with New Jersey law governing exculpatory provisions.

Here, Plaintiff argues that the Exculpatory Provisions are unenforceable, because they are both adverse to the public interest and otherwise unconscionable. Specifically, Plaintiff argues that the Provisions are adverse to New Jersey public policy, because they insulate Defendant from liability even where Defendant materially breaches its contractual obligations and "offer[] no countervailing or redeeming societal value." Pl.'s Br. at 19. Additionally, Plaintiff argues that the Provisions are procedurally unconscionable, because they are drafted in tiny print and are too inconspicuous to be enforceable. *See id.* at 24-25. Plaintiff's arguments are without merit.

Significantly, New Jersey law does not restrict the ability of alarm service providers to limit their liability through risk allocation provisions, and thus, New Jersey courts have routinely upheld exculpatory provisions in contracts for alarm services, including provisions similar to the ones contained in the Contract. *See, e.g.*, *Synnex Corp. v. ADT Sec. Servs., Inc.*, 394 N.J. Super. 577, 591-92 (App. Div. 2007) (enforcing an exculpatory clause in a contract for a burglar alarm system, which stated that ADT was not an insurer and was exempt from liability for losses caused by events that the system was designed to detect or prevent); *Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc.*, 203 N.J. Super. 477, 481-86 (App. Div. 1985) (enforcing a $250 limitation of liability provision in an alarm services contract); *Foont-Freedenfeld Corp. v. Electro-Protective Corp.*, 126 N.J. Super. 254, 257-58 (App. Div. 1973), *aff'd*, 64 N.J. 197 (1974) (affirming trial court's partial summary judgment order enforcing a limitation of liability clause in a burglary alarm services contract); *Jacobsen Diamond Ctr., LLC v. ADT Sec. Servs., Inc.*, No. A-1578-14T1, 2016 WL 3766236, at *7 (N.J. Super. Ct. App. Div. July 15, 2016) (enforcing a $1,000 limitation of liability clause in a contract for the sale of a burglary alarm system); *St. Paul Fire & Marine Ins. Co. v. Wells Fargo Alarm Servs.*, No. 95-

712, 1995 WL 306642, at *5 (D.N.J. May 9, 1995) (granting partial summary judgment on the enforceability of a limitation of liability provision in the parties' alarm services contract).

The rationale in these cases is that exculpatory provisions and limitations of liability are "reasonable measure[s] within this particular industry to contain an alarm system supplier's exposure from the losses caused by thefts or other criminal acts." *Jacobsen*, 2016 WL 3766236 at *7. In that regard, as the *Synnex* court aptly explained, sound policy reasons support the enforcement of these provisions in the context of alarm service contracts:

> [W]here the subject matter of a contract containing a limitation of liability or exculpatory clause is an alarm contract, the buyer is in the best position to know the value of its property and to insure against any loss from fire or theft, regardless of whether the alarm company's negligence was a contributing cause of the occurrence. As the contract between ADT and Synnex illustrates, the purchase price of an alarm system is generally only a small fraction of the value of the property it is designed to protect. If an alarm company were subject to liability for loss of that property, it would be hesitant to sell an alarm system to a buyer with valuable property or would insist upon payment of a premium to offset its exposure to a claim. The requirement of payment of such a premium would place the alarm company in the position of selling not only an alarm system but also a form of insurance. Thus, to determine the price for an alarm system, the company would have to determine the value of the buyer's property and its contents as well as other pertinent risk factors, such as its location, which would be similar to an insurance company's determination of the premium for a casualty insurance policy. Furthermore, insurance coverage for loss from fire or theft is readily available and is in fact maintained by most property owners including Synnex. Therefore, unlike a home buyer who contracts for a home inspection, the purchaser of an alarm system does not have to rely upon the availability of a tort claim against the seller of the system to obtain protection from loss of its property.

394 N.J. Super. at 592-93.

In *Synnex*, for example, the Appellate Division considered the enforceability of an exculpatory provision contained in an alarm services contract with ADT. There, Synnex, a distributer of computers and computer-related equipment, sued ADT following a burglary at Synnex's warehouse. *See id.* at 583. Specifically, Synnex asserted claims for, *inter alia*, negligence and breach of express and implied warranties, based on the design of the alarm

system and ADT's alleged insufficient communication with Synnex on the night of the burglary. *See id.* In the proceedings before the trial court, ADT moved for summary judgment, arguing that an exculpatory clause in the parties' alarm services contract – which required the customer to rely on its own insurance for loss from any theft – precluded Synnex's claims. *See id.* The trial court held that ADT could not rely on the exculpatory provision, based, in part, on its finding that the provision was contrary to public policy. *See id.* at 584.

The Appellate Division reversed, holding that the exculpatory provision was enforceable and did not violate public policy. *See id.* at 580-81. As an initial matter, the court noted that New Jersey courts had previously upheld similar exculpatory provisions in contracts for the sale of fire and burglary alarm systems, and that "such clauses may insulate an alarm company from liability even for 'very negligent or grossly negligent performance.'" *Id.* at 588 (quoting *Tessler*, 203 N.J. Super. at 485). Next, the court found that the exculpatory provision was not contrary to public policy, because it "simply allocate[d] responsibility to the buyer of an alarm system to maintain insurance coverage, and the buyer [was] in the best position to know the value of its property and to insure against any loss." *Synnex*, 394 N.J. Super. at 580-81.

More recently, in *Jacobsen*, the Appellate Division affirmed the trial court's summary judgment ruling that a limitation of liability provision in a contract between ADT and an uninsured store owner was enforceable. *See* 2016 WL 3766236 at *7-8. There, the store owner brought suit against ADT and various other defendants, seeking to recover over $5 million in goods stolen from the store. *See id.* at *2. The trial court granted ADT's motion for summary judgment, which sought to enforce a $1,000 limitation of liability clause in ADT's form contract with the owner. *Id.* at *3. Relying on *Synnex*, the Appellate Division affirmed the enforceability of the limitation of liability provision, finding that the limitation was a "reasonable measure" for

containing an alarm service provider's exposure from losses caused by thefts, because it merely allocated the responsibility of maintaining insurance coverage to the alarm purchaser, who was in the best position to know the value of its property and insure against losses. *Id.* at *7. With respect to the owner's public policy arguments, the court noted that, although the "responsibility of maintaining insurance coverage was expressly allocated to plaintiff[,] . . . plaintiff opted not to procure any such insurance." *Id.* at *8. Thus, finding that there was "no compelling policy reason to place the responsibility for customer losses due to theft or burglary upon ADT simply because its customer failed to take other measures within its control to manage a known risk," the Appellate Division affirmed the enforceability of the limitation of liability provision. *Id.*

As the *Synnex* and *Jacobsen* decisions illustrate, New Jersey views exculpatory provisions and limitation of liability clauses in alarm service contracts as reasonable measures for providers to limit their exposure for theft-related losses. Here, Plaintiff has failed to establish that enforcement of the Exculpatory Provisions would implicate any public policy concerns that were not present in those cases. To that end, while Plaintiff raises several arguments regarding the practicality of obtaining insurance for the Store's inventory, Plaintiff testified that he did, in fact, receive insurance quotes for the Store, and made a business decision that procuring insurance was too costly. *See* Fabricatore Dep. at 71:23-72:8; Fabricatore Cert. ¶ 26 ("When I looked into obtaining insurance, I discovered that the policies offered contained so many exclusions (while being so costly) *that it made no business sense* to obtain it for the type of coins I was dealing in."). Moreover, although the Contract provided Plaintiff with the right to increase ADT's liability in exchange for higher fees,[8] Plaintiff opted not to do so. *See Greenspan v. ADT*

_____

[8] Specifically, the Limitation on Liability Provision states: "**IF CUSTOMER REQUESTS, ADT MAY ASSUME GREATER LIABILITY BY ATTACHING A RIDER TO THIS CONTRACT STATING THE EXTENT OF ADT'S ADDITIONAL LIABILITY AND**

*Sec. Servs. Inc.*, 444 F. App'x 566, 570 (3d Cir. 2011) (enforcing a $500 limitation of liability

provision, where the plaintiffs had the right to obtain insurance and to increase ADT's limit on

its liability, but opted not to do so).  Accordingly, I find that enforcement of the Contract's

Exculpatory Provisions does not violate public policy.

Additionally, contrary to Plaintiff's argument, the Exculpatory Provisions are enforceable

even if Defendant breached its contractual obligations.  In that regard, Plaintiff fails to cite any

authority for the proposition that exculpatory provisions are unenforceable where one party

allegedly breached its contractual obligations.  To the contrary, where an exculpatory provision

is otherwise enforceable, courts routinely enforce such provisions despite any alleged contractual

breach.  *See*, *e.g.*, *Tessler*, 203 N.J. Super. at 481, 483-86 (affirming the trial court's decision to

enforce a limitation of liability provision, despite the jury's finding that the defendant failed to

perform its contractual obligations); *Sys. v. ADT Sec. Servs., Inc.*, No. 07-3579, 2008 WL

682232, at *3 (D.N.J. Mar. 7, 2008) (enforcing exculpatory provision in alarm services contract,

despite the plaintiff's allegation that ADT breached its contractual obligations by failing to

provide adequate monitoring services).  Indeed, Plaintiff is effectively arguing that this Court

should enforce Defendant's performance obligations under the Contract on one hand, but excuse

Plaintiff from the Contract's risk allocation provisions on the other.  However, because Plaintiff

has failed to demonstrate that the public interest would be adversely affected by enforcing the

Exculpatory Provisions, Plaintiff "has shown no persuasive reason to leave the [C]ontract

---

**THE ADDITIONAL CHARGES CUSTOMER WILL PAY FOR ADT'S ASSUMPTION
OF SUCH GREATER LIABILITY.**"  Contract at 6, ¶ E(3) (emphasis in original).

generally intact but then excise only the limitation of liability clause."[9] *Jacobsen*, 2016 WL 3766236 at *8.

Moreover, Plaintiff's argument that the Exculpatory Provisions are unenforceable because they are inconspicuous and set forth in tiny print is unavailing. Significantly, courts considering the enforceability of exculpatory provisions phrased in nearly identical language have found that such provisions were written with sufficient clarity to be enforceable. *See*, *e.g.*, *Tessler*, 203 N.J. Super. at 481-86; *Foont-Freedenfeld*, 126 N.J. Super. at 257-58; *Jacobsen*, 2016 WL 3766236 at *7; *Greenspan*, 444 F. App'x at 570; *St. Paul Fire*, 1995 WL 306642 at *5. Additionally, the font size of the Exculpatory Provisions is not so small as to render those Provisions unenforceable, particularly since they are set forth in bold, all-capitals font. *See Prescription Counter v. AmerisourceBergen Corp.*, No. 04-5802, 2007 WL 3511301, at *12

---

[9] I note that under New Jersey law, parties may not exculpate themselves from willful or wanton misconduct. *Tessler*, 203 N.J. Super. at 484; *see Kane v. U-Haul Int'l Inc.*, 218 F. App'x 163, 167 (3d Cir. 2007) (observing that, under New Jersey law, willful and wanton "conduct cannot be exculpated."). The Supreme Court of New Jersey has defined willful and wanton misconduct as follows:

> It must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

*McLaughlin v. Rova Farms, Inc.*, 56 N.J. 288, 305 (1970). Significantly, however, this exception applies only to willful and wanton conduct, and thus, parties may exculpate themselves from even gross negligence. *See Tessler*, 203 N.J. Super. at 485 (holding that an exculpatory provision may insulate an alarm company even for "very negligent or grossly negligent performance."). Here, as previously noted, Plaintiff has not argued that Defendant's conduct in this case falls outside the scope of the Exculpatory Provisions, or more specifically, that Defendant's conduct in failing to call Plaintiff or dispatch the police rose to the level of being willful or wanton. In any event, even viewing the facts in the light most favorable to Plaintiff, the record is bereft of any evidence suggesting that Defendant's conduct was willful or wanton. Accordingly, because no reasonable factfinder could conclude that Defendant's conduct was willful or wanton, the Court's decision on the applicability of the Exculpatory Provisions need not await a jury finding on the degree of Defendant's liability.

(D.N.J. Nov. 14, 2007) (finding that a limitation of liability provision was enforceable, even though it was written in small font, where "the paragraph that addresse[d] the limitation of liability [was] titled in all capital letters."); *Morgan Home Fashions, Inc. v. UTI, U.S., Inc.*, No. 03-0772, 2004 WL 1950370, at *4 (D.N.J. Feb. 9, 2004) ("Although the small font and light print of the relevant terms may have made them somewhat difficult to read, they do not approach the near illegibility that has been deemed too inconspicuous to be enforceable.").  Indeed, the Provisions are set forth in the same font and print size as the remainder of the terms and conditions in the Contract, including those outlining the performance obligations that Plaintiff seeks to enforce.

Finally, Plaintiff's argument that the Limitation of Liability Provision is a reverse liquidated damages provision that is unenforceable under New Jersey law ignores the Appellate Division's decision in *Tessler*.  In *Tessler*, the plaintiff brought suit against an alarm services provider, alleging that the defendant breached its contractual obligation to monitor the plaintiff's shop.  *See* 203 N.J. Super. at 480-82.  The trial court enforced a limitation of liability provision in the parties' contract, which provided:

> If [the defendant] should be found liable for loss or damage due to the failure of its services in any respect, even if due to [the defendant's] negligence, its liability shall be limited to a sum equal to ten percent of the annual monitoring charge for the premises or $250 whichever is greater, as liquidated damages and not as a penalty . . . .

*Id* at 481.  Significantly, in affirming the enforceability of the limitation of liability provision, the *Tessler* court explained that while the provision "purports to be a liquidated damage clause . . . [i]n real effect, however, it is an exculpatory clause, because it denies liability for all but a nominal amount of damages."  *Id*. at 482.  In that regard, the court explained that while liquidated damages clauses attempt to estimate the reasonable forecast of damages caused by a breach, "[t]he limit of $250 is obviously not the result of an effort to fairly estimate plaintiff's

likely damages from a break-in." *Id.* at 482; *see Morgan*, 2004 WL 1950370 at *7 n. 6

("Whereas a liquidated damages clause attempts to fairly estimate the parties' likely damages in

case of breach, an exculpatory clause 'denies liability for all but a nominal amount of

damages.'") (citation omitted). Following *Tessler*, courts applying New Jersey law have

interpreted limitation of liability provisions contained in alarm services contracts as exculpatory

provisions, rather liquidated damages clauses. *See*, *e.g.*, *Jacobsen*, 2016 WL 3766236 at *7; *St.*

*Paul Fire*, 1995 WL 306642 at *2. As in *Tessler*, here, it is clear that the Limitation of Liability

Provision, which limits Plaintiff's recoverable damages to $1,000 or 10% of the annual service

charge, is not an attempt to forecast Plaintiff's damages in the event of a burglary. Accordingly,

because the Limitation of Liability Provision is an exculpatory provision, rather than a reverse

liquidated damages provision, Plaintiff's arguments to that effect are unavailing.[10]

In sum, the Court finds that, because the Exculpatory Provision is enforceable, Plaintiff

cannot recover any damages for losses arising from the burglary of the Store on his breach of

contract claim. Additionally, the Limitation of Liability Provision is enforceable, and thus, to the

---

[10] I note that Plaintiff also argues that the Exculpatory Provisions should not be enforced, based
on Plaintiff's representations regarding the impact of the alleged forgery of the 2006 Contract on
the 2014 Contract. Specifically, in his Certification, Plaintiff asserts that "had the 2006 Contract
not been forged, I would have (prior to signing) reviewed the Terms and Conditions on the
Contract," including the Exculpatory Provisions. Fabricatore Cert. ¶ 9-11. However, as Judge
Cooper has already recognized, the 2014 Contract is the operative agreement in this case, not the
2006 Contract, and thus, Plaintiff's arguments regarding the forgery provide no basis for this
Court to hold that the Exculpatory Provisions are unenforceable. *See* ECF No. 39 at 23.
Moreover, Plaintiff's argument, distilled to its essence, is that his failure to read the 2014
Contract is attributable to the alleged forgery of the 2006 Contract, and thus, that he should be
excused from having to comply with the Exculpatory Provisions. However, it is axiomatic that
"one who does not choose to read a contract before signing it cannot later relieve himself of its
burdens." *Abel Holding Co. v. Am. Dist. Tel. Co.*, 138 N.J. Super. 137, 157 (Law. Div. 1975),
*aff'd*, 147 N.J. Super. 263 (App. Div. 1977). Accordingly, because the 2006 Contract is not the
operative agreement in this case, and because Plaintiff's failure to read the 2014 Contract
provides no basis for relieving him of his obligations, I reject Plaintiff's argument that the
Exculpatory Provisions are unenforceable based on the alleged forgery.

extent that Plaintiff seeks to recover compensatory damages outside of the Store's losses for Defendant's alleged failure to perform its contractual obligation to call Plaintiff or dispatch the Police, Plaintiff's recoverable damages on his breach of contract claim are limited to $1,000.

**B.    Remand is Warranted for Lack of Subject Matter Jurisdiction**

Having found that Plaintiff's recoverable damages on his breach of contract claim are limited to $1,000, the Court must review its subject matter jurisdiction over this case.  In that regard, pursuant to 28 U.S.C. § 1447(c), removed cases, such as the case at bar, may be remanded at any time before final judgment, if the district court determines that it lacks subject matter jurisdiction over the case.  28 U.S.C. § 1447(c); *see DeJoseph v. Cont'l Airlines, Inc.*, 18 F. Supp. 3d 595, 597 (D.N.J. 2014) ("Removal is not appropriate if the case does not fall within the district court's original federal question jurisdiction and the parties are not diverse.").

Here, the jurisdiction of this Court was based solely on the existence of diversity jurisdiction under 28 U.S.C. § 1332.  For diversity jurisdiction to exist under § 1332, each party must be of diverse citizenship from each other and the amount in controversy must exceed $75,000.  28 U.S.C. § 1332(a); *see Grand Union Superm. of the Virgin Isl., Inc., v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003).  The parties are of diverse citizenship, and, at the time this case was removed, Plaintiff asserted eight causes of action, exceeding the threshold jurisdictional amount.  Nonetheless, Plaintiff's sole remaining cause of action in this case is his claim for breach of contract, and, because I have determined that $1,000 Limitation of Liability Provision is enforceable, Plaintiff's maximum recovery in this case is less than the required jurisdictional amount.  Accordingly, because the minimum amount in controversy for diversity jurisdiction is no longer satisfied, this Court is without subject matter jurisdiction and remand is appropriate.  *See Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 209 (3d Cir. 1995)

("Because we have concluded that the limitation of liability clause is an enforceable part of the contract which is the basis of this diversity action, [the plaintiff's] maximum possible recovery is $50,000. . . . Accordingly, we will vacate the order of the district court and remand with directions to dismiss for lack of subject matter jurisdiction.").

That said, Plaintiff has moved for reconsideration of the Magistrate Judge's Order denying Plaintiff's request for leave to amend his NJCFA claim. If Plaintiff were able to assert such a claim, the jurisdictional amount may exceed $75,000. Accordingly, this Court will delay a determination on remand pending a decision on the Motion for Reconsideration.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part, as follows: (i) Defendant's Motion is granted, insofar as Defendant seeks an order that the Exclusionary Provision bars Plaintiff from recovering damages for the Store's losses; (ii) Defendant's Motion is denied, insofar as Defendant seeks an order that the Exclusionary Provision bars Plaintiff from recovering any damages on his breach of contract claim; and (iii) Defendant's Motion is granted, insofar as Defendant seeks an order that any damages that Plaintiff can recover on his breach of contract claim are limited to $1,000 under the Limitation of Liability Provision.


Dated:  July 2, 2018                                              /s/ Freda L. Wolfson
                                                                            Hon. Freda L. Wolfson
                                                                            United States District Judge